```
             UNITED STATES DISTRICT COURT FOR THE
                   DISTRICT OF NEW HAMPSHIRE
```

**Loranda Sue Duquette**

    **v.**                                  Civil No. 10-cv-204-PB
                                                Opinion No. 2011 DNH 121

**Michael Astrue, Commissioner,**
**Social Security Administrat**

## MEMORANDUM AND ORDER

Loranda Sue Duquette filed a complaint seeking review, pursuant to 28 U.S.C. § 405(g), of the Commissioner's decision denying her application for disability insurance benefits and supplemental security income. Duquette moves to reverse the Commissioner's decision on the grounds that the Administrative Law Judge ("ALJ") erred in failing to give controlling weight to the opinion of her treating physician and that substantial evidence is lacking to support the ALJ's residual functional capacity ("RFC") assessment. The Commissioner moves to affirm the decision. For the reasons provided below, I affirm the Commissioner's decision.

## I.  BACKGROUND[1]

Loranda Sue Duquette was thirty-eight years old when she applied for Social Security benefits due to cervical and spinal problems, right arm pain, and a right foot injury from a motorcycle accident.  She left high school in the eleventh grade and had worked as an assembler, a caretaker, a personal care attendant, a camp cook, and a bookkeeper.  Duquette's last insured date was December 31, 2008.

### A.  Medical Treatment Records

In June 2006, Duquette saw her primary care physician, Dr. Judith Boule, at Dartmouth-Hitchcock Medical Center, "Medical Center," to request additional Percocet, an opioid and analgesic medication used to treat moderate to severe pain, for her back pain.  Duquette explained that she planned to attend the motorcycle events at "Bike Week" and needed medication to be able to ride a motorcycle.  Dr. Boule prescribed the additional Percocet, along with muscle relaxant medication, cyclobenzaprine.

During Bike Week, on June 18, 2006, Duquette was in a motorcycle accident and was transported to Lakes Region General Hospital.  On examination in the emergency room, Duquette was

---

[1] The background information is taken from the parties' Joint Statement of Material Facts.  See LR 9.1(b).  Citations to the Administrative Transcript are indicated by "Tr."

found to have a subtle fracture of her right big toe, a contusion of the pelvis, and abrasions. She was prescribed Vicodin for pain control. Dr. Boule examined Duquette the next day. Because of her abrasions and abdominal pain, Dr. Boule refilled Duquette's prescription for Percocet and provided other medications. A week later, Duquette saw a physician's assistant in Dr. Boule's office because of rib pain. Although testing showed no abnormalities, Duquette's Percocet prescription was refilled. A month later, Dr. Boule referred Duquette to a podiatrist to address foot pain.

In August 2006, Duquette saw Linda Groiss, a physician's assistant, complaining of foot pain. Examination and testing showed abnormalities in Duquette's foot possibly related to plantar fasciitis. Duquette continued treatment with Groiss; Dr. Boule; Dr. Ruelle, podiatrist, and underwent physical therapy for right foot pain until February 2007, when she was determined to have met her therapeutic goals. In April 2007, however, Duquette saw Dr. Ruelle again for foot pain and was then fitted for orthotics.

Duquette reported a "list of concerns" to Dr. Boule in May 2007, which included reflux, foot pain, anxiety, and attention deficit hyperactivity disorder ("ADHD"). Dr. Boule prescribed medications including Percocet. Two weeks later, Duquette told

Dr. Boule that she was having shoulder pain and that her Oxycodone had been stolen from her car.  Dr. Boule told Duquette to file a police report about the theft, gave her an injection for her shoulder pain, and diagnosed chronic back pain and ADHD. In June, Duquette returned because of shoulder pain, and Dr. Boule refilled her Percocet prescription, prescribed a steroid, and referred Duquette to an orthopedist.

In July 2007, Duquette went to the Medical Center's emergency room because of arm pain.  Examination showed no abnormalities, and she was discharged with topical pain relief cream.  Duquette went to Dr. Boule's office the same day, in tears, asking for pain medication because of her shoulder pain. An MRI scan done on July 27 showed disc herniation at C6-7 causing severe spinal stenosis, meaning encroachment of the bone into the space of the spine.  Dr. Boule prescribed Oxycodone.

During the remainder of 2007, Duquette had appointments with Dr. Boule, a physician's assistant, and Dr. Mark Silbey for right arm pain and numbness in her hands.  Based on an MRI scan, Dr. Silbey concluded that Duquette likely had nerve impingement in her spine.  Duquette had a steroid injection in September.

On August 10, 2007, Dr. Boule completed an RFC assessment. Dr. Boule stated that Duquette would not be able to work for six to twelve months because she could not sit continuously.  Dr.

Boule also stated that Duquette could only lift or carry ten pounds occasionally and could not use her right hand and could use her left hand only occasionally for grasping, fine manipulation, pushing, and pulling.  Dr. Boule also excluded Duquette from kneeling, bending, crouching, climbing, crawling, reaching above shoulder level, and twisting.

In September 2007, Duquette again reported that her pain medications had been stolen from her car and asked for refills.  Despite the lack of a police report to confirm the theft, Dr. Boule refilled Duquette's prescriptions.  Dr. Boule, however, required a urine sample for testing, which was positive for, among other things, cocaine.  Testing in October again showed positive results for cocaine, and the Medical Center refused to provide additional pain medications.  As a result, Duquette hired an attorney who threatened the Medical Center with legal action if Duquette were not provided with pain medications.  Dr. Heneghan at the Medical Center told Duquette to go to the emergency room and refused to prescribe pain medications.

On November 26, 2007, Duquette saw Dr. Dilip Sengupta on referral from Dr. Boule.  Dr. Sengupta found a two level disc degeneration with herniation of mild to moderate size.  His examination revealed normal gait, free movement of the shoulders, full cervical range of motion with complaints of pain, and

complaints of numbness in the fingers but no objective weakness there.  Dr. Sengupta recommended conservative treatment rather than surgery.  Dr. Joseph Signorelli saw Duquette the same day for her neck and arm problems.  He reported that Duquette said she continued to take Percocet, obtaining it any way she could.  He found Duquette had trouble sitting still but that her gait, neck, and strength were all normal.

On December 6, 2007, Dr. Hugh Fairley, a state agency consulting physician, completed a physical RFC assessment based on Duquette's medical records.  Dr. Fairley concluded that Duquette could lift and carry twenty pounds occasionally and ten pounds frequently, could stand, walk, or sit for six hours during an eight-hour day, should avoid overhead reaching with her right arm, and could do work at the light exertional level.  Dr. Fairley considered Dr. Boule's assessment but found that it was not supported by the record.

Duquette again tried to obtain Percocet from Dr. Boule's office in December 2007.  Dr. Ruelle also saw Duquette for foot pain in December.  On examination, Dr. Ruelle found no pain on palpitation and concluded that the foot problem was almost resolved.

On April 7, 2008, Dr. Sengupta examined Duquette because of her complaints of neck and arm pain.  Duquette had not followed

6

Dr. Sengupta's previous treatment advice and asked for narcotic pain medication.  When Dr. Sengupta offered non-narcotic medication, Duquette was not interested and was rude.  She said she would not have surgery without first getting a prescription for narcotic medications.

   On June 26, 2008, Dr. Avigdor Niv completed a medical source statement of Duquette's ability to do work-related activities for the Social Security Administration.  Dr. Niv concluded that Duquette could lift and carry ten pounds frequently and twenty pounds occasionally and could sit, stand, and walk for a total of six hours in an eight-hour work day.  Dr. Niv indicated some limitations in Duquette's ability to use her hands and to engage in posture activities such as climbing.

   In August 2008, Duquette was treated at the Medical Center emergency room for injuries caused by a fall at home.  She was diagnosed with dizziness and right clavicle fracture.  She returned in September seeking additional Vicodin for pain.  She was prescribed Percocet and discharged.  On follow up for her shoulder injury, the provider noted that Duquette had tried to work but could not carry a vacuum pack.  She was prescribed a muscle relaxant in addition to Vicodin and was instructed to avoid working as a housekeeper.

In early October 2008, Duquette was treated at the Medical Center emergency room for injuries caused during a fight with a friend while they were drinking.  Duquette's blood alcohol level was .15.  She was discharged in good condition and was instructed to avoid strenuous activity for two days.

On April 3, 2009, Duquette was again treated at the Medical Center emergency room following a fall at home.  She complained of lower back pain, but imaging did not confirm a fracture.  She was prescribed Percocet.  On April 10, 2009, Duquette saw a nurse practitioner for neck pain.  The nurse practitioner assessed mechanical cervical pain with probable radiation and mechanical lower back pain.

On June 29, 2009, Duquette met with Dr. Marika Ostroski at the Cheshire Medical Center.  Duquette described chronic neck pain with numbness and tingling in her neck and arms.  Dr. Ostroski referred Duquette to a neurosurgeon and prescribed pain medication.

Duquette was referred to Dr. Somail Mirza on July 22,, 2009. Duquette told Dr. Mirza that she was limited in her daily activities because of pain in her left shoulder, radiating to her fingers, and weakness in her arms.  On examination, Duquette showed normal gait and normal strength and reflexes.  Dr. Mirza reviewed the April 2009 MRI results and found some degenerative

changes but no nerve root compression or disc protrusion and no spinal cord signal change. He did not recommend surgery but did recommend further testing because of the severity of Duquette's subjective complaints.

On August 24, 2009, Joan Van Saun, an occupational therapist, conducted a functional capacity evaluation of Duquette. Duquette described problems with her left arm and neck. On examination, Van Saun found normal grip and arm strength. Nevertheless, Van Saun wrote that Duquette could only perform fine motor or handling tasks for up to one hour, that she could lift up to twenty pounds occasionally, and that she was limited to part-time sedentary work.

Duquette was taken by ambulance to Cheshire Medical Center on September 4, 2009, after she was injured while riding an ATV and doing "doughnuts." Her primary injury was a facial fracture. All other results of examination were normal, and the degenerative cervical changes were described as minor.

On September 10, 2009, Dr. Nancy Bagley did a nerve conduction and EMG test to further examine Duquette's claims of arm and finger pain. Although Duquette claimed weakness in her left arm, the tests yielded normal results. The tests did not conclusively rule out plexopathy or radiculopathy. Duquette again tested positive for illegal drugs.

In October, Duquette had another accident on an ATV. This time she complained of rib pain. She had pain in the rib area on palpation, but no abnormalities were found through imaging. She was prescribed a Fentanyl pain patch.

Dr. Ostroski completed an RFC assessment on December 10, 2009. Dr. Ostroski did not provide a diagnosis of Duquette's condition. Instead, she repeated Duquette's subjective complaints of neck and left arm pain, numbness, tingling, and weakness. Dr. Ostroski also said that Duquette's symptoms affected her right side as well. She also wrote that clinical findings and objective signs supported neck and arm pain and weakness, along with anxiety and depression. She stated that Duquette's symptoms had been at the same level since March 2007, that Duquette's impairments were consistent with her symptoms, and that her pain would frequently interfere with her attention and concentration. Dr. Ostroski also stated that Duquette was capable of doing low-stress work that would allow a sit or stand option and unscheduled breaks. She said that Duquette could walk for up to one mile and could sit or stand for an hour before changing position, that she could lift only ten pounds rarely and could rarely turn her head, and that she had significant limitations in reaching, handling, and fingering. Dr. Ostroski also thought that Duquette would miss more than four days of work

in a month.

**B.   <u>Procedural History</u>**

Duquette applied for Social Security benefits in August of 2007, alleging a disability beginning March 31, 2007.  When her application was denied, she requested a hearing before an ALJ.  A hearing was held on December 7, 2009.

Duquette, who was represented by counsel, testified at the hearing.  She stated that she originally had problems with her right arm, but the pain later transferred to her left arm.  She said that she could not sit very long, that she had pain in her neck if she did not sit properly, and that her foot hurt if she stood for too long.  She testified that she avoided lifting anything heavier than a gallon of milk, that she could drive, that she could walk for a half mile, and that she could stand for a half an hour.

A vocational expert ("VE") also testified.  In response to a hypothetical question posed by the ALJ pertaining to a person limited to work at the light exertional level with certain other restrictions, the VE testified that such a person could perform Duquette's former work as a bookkeeper and a cook.  The ALJ then added additional weight and other limitations, and the VE responded that those restrictions did not preclude work as a data examination clerk or telephone solicitor.  Duquette's counsel

11

asked about restrictions that required an option to recline for half an hour to an hour twice in a work day, and the VE responded that such restrictions would preclude all work.

The ALJ issued a decision on January 4, 2010.  He found that Duquette had severe impairments of mild degenerative disc disease, status post resolved clavicle fracture, and post resolved plantar fasciitis.  The ALJ found that with those impairments Duquette retained the functional capacity for light work, although she might require a sit/stand option and had limitations in her ability to reach, climb, and do other postural activities.  Based on that RFC and the VE's opinion, the ALJ concluded that Duquette could return to her former work as a bookkeeper and a cook and could also perform other work that existed in significant numbers in the national economy.  The ALJ, therefore, found that Duquette was not disabled.

The ALJ's decision became the final decision of the Commissioner when the Decision Review Board failed to complete its review within the time allowed.

## II. **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying,

or reversing the "final decision" of the Commissioner.  Review is limited to determining whether the ALJ used the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'"  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Ortiz, 955 F.2d at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record.  Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

### III. ANALYSIS

Duquette contends that the ALJ's RFC assessment that she retained the ability to do work at the light exertional level with certain other limitations was not supported by substantial evidence. She also contends that the ALJ erred by not according controlling weight to Dr. Ostroski's opinions and by giving greater weight to the state agency consulting physicians' opinions. The Commissioner moves to affirm the decision. Because the weight given to the medical opinions could affect review of the ALJ's RFC assessment, I begin with that issue.

### A. Weight of Opinions

A treatment provider's opinions will be given controlling weight if the "treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). The ALJ "'may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors.'" Coggon v. Barnhart, 345 F. Supp. 2d 40, 52 (D. Mass. 2005) (quoting Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002), and citing

Rosario v. Apfel, 85 F. Supp. 2d 62, 67 (D. Mass. 2000)).

When a treating source's opinion is not entitled to controlling weight, the ALJ determines the amount of weight based on factors that include the nature and extent of the source's relationship with the applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source is a specialist in the field.  20 C.F.R. § 404.1527(d)(1-6).  In addition, the ALJ must give reasons for the weight given to treating source opinions.  Id.; see also Soto-Cedeno v. Astrue, 380 Fed. Appx. 1-2 (1st Cir. 2010).

### 1.   Dr. Ostroski's Opinions

Dr. Ostroski stated that Duquette could sit for only two hours, could walk or stand for two hours in an eight-hour work day, could rarely lift even ten pounds, would need to change positions at will and need unscheduled breaks, and had other postural limitations.  The ALJ decided that Dr. Ostroski's opinion was entitled to little weight because it was inconsistent with the medical evidence in the record.  The ALJ cited the contrary evidence and also noted that despite her severely limited assessment, Dr. Ostroski concluded that Duquette was capable of working at a low stress job.  Duquette disputes the ALJ's analysis, citing her subjective complaints of pain reported

15

to the occupational therapist and other health care providers.

The medical records cited by the ALJ provide substantial evidence to support his conclusion. In addition, as the ALJ wrote, despite Duquette's complaints, she was able to ride an ATV, which resulted in an accident and injuries in September of 2009, and objective testing done in September 2009 showed normal results. Therefore, the ALJ properly decided not to give controlling weight to Dr. Ostroski's opinions to the extent those opinions limited Duquette's RFC beyond the scope of light work with certain other restrictions.

### 2. State Agency Physicians' Opinions

Duquette contends that the ALJ erred in giving more weight to the opinions of the state agency physicians, Dr. Fairley and Dr. Niv than to Dr. Ostroski's opinion. Duquette challenges the opinions of Dr. Fairley and Dr. Niv on the ground that they did not have the occupational therapist's vocational capacity report and Dr. Ostroski's RFC assessment.

> SSR 96-6p provides that state agency consultants' opinions
> 
> can be given weight only insofar as they are supported
> by evidence in the case record, considering such
> factors as the supportability of the opinion in the
> evidence including any evidence received at the
> administrative law judge and Appeals Council levels
> that was not before the State agency, the consistency
> of the opinion with the record as a whole, including
> other medical opinions, and any explanation for the
> opinion provided by the . . . consultant.

SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). In addition, consultants' opinions "may be entitled to greater weight than the opinions of treating or examining sources" in some circumstances, including but not limited to a situation when the opinion is based on a review of a more complete case record than what was available to the treating or examining source. See id. at *3.

In this case, the ALJ acknowledged that Duquette's allegations of pain had changed since Dr. Fairley gave his opinion and that the medical record generated after his opinion supported slightly greater limitations. For that reason, the ALJ gave Dr. Fairley's opinion only some weight. The ALJ found that Dr. Niv's opinion was "fairly consistent" with Duquette's medical evidence, but based on Duquette's testimony at the hearing, the ALJ found that she had no significant limitation in her ability to reach, which was contrary to Dr. Niv's opinion. The ALJ gave Dr. Niv's opinion more weight than Dr. Fairley's opinion but slightly less than "great weight."

Because the ALJ carefully explained the weight given to the state agency physicians' opinions and the reasons are consistent with the record, substantial evidence supports the ALJ's determination.

**B.   Residual Functional Capacity**

An individual's RFC is ordinarily that individual's "maximum

17

remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," and any RFC assessment "must include a discussion of the individual's abilities on that basis."  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996); see also 20 C.F.R. § 404.1545.  In making that assessment, the ALJ "will consider all of [the applicant's] medically determinable impairments of which [the ALJ is] aware, including [the applicant's] medically determinable impairments that are not 'severe' . . . ."  20 C.F.R. § 404.1545(a)(2).

The ALJ found that Duquette retained the functional capacity to do light work, although she could only occasionally reach overhead with her left arm, climb ladders and ramps, and crawl and she might require a sit or stand option.  Duquette contends that the ALJ's assessment is not supported by substantial evidence, relying on her history of treatment for back and shoulder problems and the opinions of the occupational therapist and Dr. Ostroski.

The ALJ did not find Duquette's description of the severity and limiting effects of her symptoms fully credible. In support of his RFC assessment, the ALJ reviewed the medical evidence, which included evidence that Duquette's symptoms were resolved or not as severe as she claimed and evidence of "noncompliance with treatment and drug seeking behavior."  (Tr. 13).  The ALJ also

noted that Duquette's attempt to return to work in September 2008 was unsuccessful only because of her clavicle injury at that time.  The ALJ further noted that by 2009, Duquette was able to function well without narcotic medication, which supported a conclusion that her symptoms were not as severe as she had alleged.

As is discussed above, the ALJ explained and appropriately discounted Dr. Ostroski's opinions as to the severity of Duquette's limitations.  The ALJ noted that the occupational therapist, Joan Van Saun, found that Duquette had a full range of motion and full strength in her arms and legs and reported to Van Saun that she walked to relieve her pain.  The ALJ's RFC assessment is supported by substantial evidence.

## IV.  CONCLUSION

The ALJ's decision is supported by substantial evidence in the record.  Therefore, I lack the authority to overturn it. Plaintiff's Motion for Order Reversing the Commissioner's Decision (Doc. No. 8) is denied.  The Commissi1oner's Motion for Order Affirming the Decision (Doc. No. 10) is granted.

The clerk shall enter judgment accordingly and close the case.

```
     SO ORDERED.


                                   /s/Paul Barbadoro
                                   Paul Barbadoro
                                   United States District Judge

July 28, 2011

cc:  D. Lance Tillinghast, Esq.
     T. David Plourde, Esq.
```